## DWIGHT BRAMAN *vs.* EUGENE N. FOSS.

Suffolk. December 6, 1909. — January 8, 1910.

Present: KNOWLTON, C. J., MORTON, BRALEY, SHELDON, & RUGG, JJ.

*Equity Pleading and Practice*, Master, Bill, Answer, Decree, Appeal. *Equity Jurisdiction*, For an accounting, Mistake, Circuity of action.

A bill in equity alleged that, to secure the repayment of cash advances by the defendant to the plaintiff, the plaintiff gave to the defendant in 1900 his promissory note for $58,000 and a conveyance of certain real and personal property; that in 1903 the defendant gave to the plaintiff a statement of their account which showed a balance due to the defendant of $51,000 "and the value of six hundred shares" of the capital stock of a certain corporation; that, relying on the accuracy of that statement, the plaintiff and the defendant entered into an agreement which contained an acknowledgment that the amount due to the defendant was $51,000 and the value of the six hundred shares of stock, and made some readjustments of securities; that the statement, because of a mutual mistake of the parties, was inaccurate in that the amount of balance was in excess of that owed to the defendant, "said excess amounting to more than $12,000 and the six hundred shares of" stock; and that the defendant refused to comply with a request by the plaintiff to rectify the mistake. The prayers of the bill were for a cancellation and surrender of the agreement of 1903, a restoration of the parties to the *status quo,* and "that an accounting may be held between the plaintiff and the defendant, and that the amount now due from the plaintiff to the defendant may be determined." The answer contained an averment that the statement of 1903 was accurate and that the obligation of the plaintiff to deliver the shares of stock "was expressly excepted from said agreement [of 1903] by apt words therein contained." The case was referred to a master and, after it had been pending before him for a year and four months, and before he made his report, the plaintiff amended his bill among other respects by adding a prayer for "an accounting of all transactions between the plaintiff and the defendant." By a written stipulation filed with the master, it was agreed that but five matters were left in controversy, one of which was whether the plaintiff was bound to deliver the shares of stock to the defendant. The master found that the plaintiff should deliver to the defendant the shares and the dividends that had accrued thereon. The plaintiff excepted to the report on the ground that the finding was beyond the scope of the pleadings. *Held,* that the exception must be overruled, since the finding was within the scope of the pleadings.

Ordinarily, if a defendant in a suit in equity desires affirmative relief, he must resort to a cross bill; but in suits to settle the affairs of a partnership, or for the foreclosure or redemption of a mortgage where a statement of accounts is involved, or in a suit for an accounting, both parties are actors and a defendant may have a decree in his favor without the aid of a cross bill.

In a suit in equity for an accounting of transactions, among others, between the plaintiff as a stockbroker and the defendant as his customer, the question of

whether the plaintiff should deliver to the defendant certain shares of stock of a corporation was put in issue by the pleadings. There was no cross bill. A master to whom the suit was referred found that the defendant was "entitled to these shares of stock with all dividends which have been paid upon them." Exceptions of the plaintiff to the report were overruled and a final decree was entered which stated "that there exists an unfulfilled and unliquidated obligation on the part of the plaintiff to deliver to the defendant" the shares of stock "and to pay to the defendant the amount of all dividends which have been paid them." There was no order that the plaintiff should deliver the stock or pay the dividends. The plaintiff appealed, but the defendant did not. *Held,* that the decree establishing the obligation of the plaintiff as to the shares of stock was within the scope of the pleadings, and that the plaintiff's appeal must be dismissed; and *it seems,* that to avoid further litigation, the defendant, if he had asked for it, might have been granted affirmative relief by an order to the plaintiff to deliver the stock and pay the amount of the dividends.

BILL IN EQUITY, filed in the Supreme Judicial Court on November 10, 1904, alleging in substance that to secure future advances the plaintiff on July 31, 1900, gave to the defendant his note for $58,000, secured by a mortgage on certain real estate and an assignment of a claim for services as receiver of a railroad company; that in the spring of 1903 the defendant furnished to the plaintiff a statement of the account between them made up by a third person according to which the plaintiff owed the defendant "$51,648.79 and the value of six hundred shares of Reading second preferred"; that, relying on the accuracy of the statement, the plaintiff entered into an agreement in writing with the defendant on May 9, 1903, changing the securities to be held by the defendant, the agreement being drawn up on the theory that the debt of the plaintiff to the defendant was "$51,648.79 and the value of six hundred shares of Reading second preferred" and containing an acknowledgment to that effect; that by mutual mistake of the plaintiff and the defendant the plaintiff "was wrongly charged in said agreement with an amount greatly in excess of that due from him" to the defendant, "said excess amounting to more than $12,000 and six hundred shares of Reading second preferred stock"; that upon discovering the mistake the plaintiff called it to the attention of the defendant and requested that it be rectified, but that the defendant refused to grant the request. The prayers of the bill were in substance that the agreement of May 9, 1903, be cancelled and surrendered and the parties be restored to the *status quo,* "that an accounting may be held between the plaintiff

and the defendant, and that the amount now due from the plaintiff to the defendant may be determined."

In his answer the defendant stated among other things that he admitted " that the amount due from the plaintiff to him was set forth in an agreement dated May 9, 1903, but he avers that the obligation of the plaintiff to deliver the stock aforesaid [the six hundred shares of Reading second preferred stock] was expressly excepted from said agreement by apt words therein contained; and he avers further that such amount was justly and truly stated in said agreement."

On June 2, 1905, the case was referred to R. D. Weston, Esquire, as master, "to hear the parties and their evidence, to find the facts, and report the same to the court."

On October 5, 1906, the plaintiff amended his bill by stating other facts with regard to items for which he contended the defendant should account to him, and by adding a prayer containing the following : " That an accounting of all transactions between the plaintiff and the defendant be had, and the amounts due by the plaintiff to the defendant and the defendant to the plaintiff be determined, . . . and all other claims of whatsoever nature the plaintiff has against said defendant."

In his report, the master made the following findings with regard to the six hundred shares of second preferred capital stock of the Philadelphia and Reading Railroad Company, called " Reading second preferred " :

" For a number of years previous to October 1, 1900, the plaintiff carried on business as a stockbroker in Boston, with a seat in the stock exchange. The business was conducted under the name of Dwight Braman and Company. In 1897 the defendant opened an account with Dwight Braman and Company and bought through the plaintiff from time to time various stocks, and among others one thousand shares of Reading second preferred. These were bought January 22, 1899.

" On the 1st of June, 1900, Braman owed Foss various stocks, the value of which greatly exceeded what Foss owed him. Braman could not deliver the stocks without borrowing the money to pay off loans for which the stocks were pledged. Braman owned certain real estate, and had a claim for services as the receiver of a western railway company, which he could

give as security for a loan.    On this security Foss was willing
to make the advances required to enable Braman to take up and
deliver the stocks to which Foss was entitled.    The total amount
required was estimated to be $58,000.    It was accordingly ar-
ranged between them that Braman should give Foss a note for
$58,000, secured by a mortgage of the real estate and the claim
for receivership fees, and that Foss, mainly for the purpose
above described, should make advances to the amount of the
note.    This arrangement was carried out.

"In pursuance of this arrangement Foss made advances to
Braman as the stocks to which he was entitled were delivered.
Advances for certain other purposes were also made by Foss
with which Braman was charged.    On August 1 Braman owed
Foss a balance of $43,462.20, and, in addition thereto, eight
hundred shares of Reading first preferred and six hundred shares
of Reading second preferred stock.    Between that date and Oc-
tober 1, 1900, the eight hundred shares of Reading first pre-
ferred were delivered on an advance by Foss of $21,800, which
with certain other advances, dividends, and interest charges car-
ried the total credits up to $73,113.98.    There were no charges
against this amount, but Braman had agreed to turn over to Foss
or his appointee Braman's seat in the stock exchange at an agreed
price of $22,000, and during September this negotiation was in
progress.    About October 1, the transfer of the seat was com-
pleted, and Foss was charged on the books with $22,000, which
was deducted from the total of the credits above stated, leaving
$51,113.98 due from Braman to Foss in money and the six hun-
dred shares of Reading second preferred, with which we are now
dealing, due to Foss in kind.

"Braman did not ask Foss to make any further advances on the
mortgage note to enable him to deliver the six hundred shares
of Reading stock.    On the contrary, he told Foss that this stock
was pledged, with other collateral, to Russell Sage in a transac-
tion from which Braman hoped to realize large profits, and re-
quested Foss not to insist on a present delivery.    To this Foss
consented.    So the matter was left and it did not appear that
anything more was said about it until Foss and Braman entered
into negotiations in the spring of 1903 which culminated in the
agreement dated May 9, 1903.

" The obligation to deliver these six hundred shares of Reading stock existed in full force and vigor on October 1, 1900. It did not depend in any way upon Braman's getting an advance from Foss. Foss had paid for the stock and Braman was bound to deliver it. If the plan contemplated had not been modified Braman would have borrowed more money on the mortgage note and the stock would have been taken up and delivered to Foss. As it was, the parties agreed, at Braman's request, that the delivery might be postponed and, of course, no further advance was called for. I find that there was no refusal to deliver the stock in October, 1900, and no breach of contract. It was still understood that the stock would ultimately be delivered. How soon it would be delivered was not settled by the agreement.

" As I have said, nothing occurred between the parties in respect to this stock, so far as appeared, until late in the spring of 1903, when Braman recognized [in letters which the master set forth] the obligation to deliver it as a then existing obligation. . . .

" And in the agreement of May 9, 1903, after the recitals and in the first of the paragraphs or articles containing the agreements of the parties, the amount then due from Braman to Foss on the $58,000 note was agreed to be $51,648.79 and ' that said indebtedness is in addition to the obligation of said Braman to deliver to said Foss six hundred shares of Reading second Preferred Stock, so-called.' . . .

" The obligation to deliver six hundred shares of Reading second preferred was a matter wholly outside the mortgage. If Foss had advanced money to enable Braman to take up and deliver the stock, Foss would have got his stock and the money advanced for it would have been added to the mortgage debt. This, however, was not done. The obligation to deliver the stock was not secured by the original mortgage, and the parties did not attempt, by the agreement of 1903, to enlarge or extend the scope of the mortgage in this respect.

" The obligation to deliver six hundred shares of Reading second was not created, nor was it even revived, by the agreement of 1903. The clause of the agreement which I have quoted is nothing more than an admission that the obligation still existed, and that it was a something distinct from the mortgage debt.

"In August, 1903, when the agreement of 1903 was actually executed, this obligation to deliver six hundred shares of Reading second preferred had already existed for nearly three years. And up to the time when the bill of complaint was filed there was no refusal of Braman to deliver, no repudiation of the obligation, and no change in the relations of the parties from which a refusal to deliver could have been inferred. At no time was Foss bound to regard the contract as broken, and to buy the stock in the market. He has always had a right to suppose that at some time Braman would perform the contract specifically by delivering the shares.

"I find and rule that Foss is now entitled to these shares of stock, with all dividends which have been paid upon them. What dividends, if any, have been paid since October 1, 1903, and what the present market value of these shares may be were not proved in evidence before me."

The substance of the plaintiff's exceptions to the master's report is stated in the opinion. An interlocutory decree was ordered by *Sheldon*, J., overruling the exceptions and confirming the report; and subsequently a final decree was entered stating "that there exists an unfulfilled and unliquidated obligation on the part of the plaintiff to deliver to the defendant six hundred shares of the second preferred stock of the Reading Company, and to pay to the defendant the amount of all dividends which have been paid thereon by said Reading Company since October 1, 1900"; stating the amount of indebtedness of the plaintiff to the defendant and the security which the defendant held therefor, and that "except as hereinbefore stated, neither party is indebted to the other in any way or on account of any matter or thing whatsoever." The plaintiff was not ordered to do anything except pay costs to the defendant.

The plaintiff appealed.

*J. L. Putnam*, for the plaintiff.

*S. R. Wrightington*, for the defendant.

BRALEY, J. The case having been referred to a master, the plaintiff alleged several exceptions to the report, of which only those relating to the six hundred shares of Reading stock having been argued, the others may be considered as waived. It appears, upon evidence not reported, that the master determined

that the defendant was entitled not only to the shares, but to the dividends which had accrued, and been paid to the plaintiff. The argument is, that the finding, being beyond the scope of the bill, is not justified by the pleadings. If the prayers for relief were limited to a cancellation of the agreement which it was alleged had been fraudulently procured and a reconveyance of the land and an assignment to the plaintiff of an outstanding mortgage and note held by the defendant, with an accounting to determine what amount the plaintiff owed the defendant, the fourth paragraph of the bill alleges that the value of the shares in dispute was included in the gross amount due from the plaintiff under the instrument. But after reference to the master and a partial hearing before him, the plaintiff amended his bill by adding another paragraph containing allegations as to other transactions, and a general prayer, in which he asked for an accounting of all transactions between them, and that his rights be determined in all claims of whatsoever nature he had against the defendant. It would seem sufficiently plain, that the title to the shares had been put in issue by the pleadings, when the defendant in his answer to the original bill avers, that by the terms of the agreement the indebtedness is in addition to the obligation of the plaintiff to deliver the shares. If any doubt however remained, it is removed by the statements in the report, that under a written stipulation of the parties but five matters were left in controversy under the bill as amended, one of which was, whether the plaintiff was bound to deliver the shares to the defendant. By the order of reference, unless waived at the hearing, the master was required to pass upon the issues presented by the pleadings, and until the right of property in the shares had been determined, the account could not be stated. The interlocutory decree overruling the plaintiff's exceptions to the report must be affirmed.

It is further contended, that so much of the final decree as declared that it is the duty of the plaintiff to deliver the stock to the defendant and pay over the dividends received, is erroneous. The plaintiff does not controvert the general principle, that where a court of equity obtains jurisdiction of a controversy on any ground, it will, to avoid multiplicity of suits, administer complete relief by the adjustment of all equities connected with

the subject of the suit, which may be authorized by the plead-ings. *Richards* v. *Todd*, 127 Mass. 167. *Rathbone* v. *Warren*, 10 Johns. 587. If, however, a defendant desires affirmative relief, he must resort to a cross bill. *Andrews* v. *Gilman*, 122 Mass. 471. But in suits to settle the affairs of a partnership, or for the foreclosure or redemption of a mortgage where a state-ment of accounts is involved, or in a bill for an accounting, both parties are actors, and a defendant may have a decree in his favor without the aid of a cross bill. *Goldthwait* v. *Day*, 149 Mass. 185. *Worthington* v. *Waring*, 157 Mass. 421,429. *Done's case*, 1 P. Wms. 263. *Glenn* v. *Hebb*, 17 Md. 260. *Wyatt* v. *Sweet*, 48 Mich. 539. *Jenks* v. *Smith*, 14 R. I. 634. *Raymond* v. *Came*, 45 N. H. 201. The defendant's claim to the stock is not independent of the bill, for by putting the title in issue the plaintiff admits the defendant's right to have the ownership settled. The master explicitly finds, that the transactions, out of which the shares in issue remained, consisted not only of occasional balances in money the defendant owed the plaintiff, but of stocks bought for the defendant and owned by him, although standing in the name of the plaintiff, the value of which largely exceeded the pecuniary indebtedness. The report further states, that having pledged these stocks to secure his personal loans, the plaintiff being unable to deliver them, the defendant advanced the money for redemption after receiving as security a mortgage on certain real estate of the plaintiff. If with the defendant's consent the stock had been sold and the proceeds received by the plaintiff, the balance due would have been the avails of the sale for which the defendant would have been entitled to a decree. *Goldthwait* v. *Day*, 149 Mass. 185. If an accounting has been held to mean the acknowledgment of an existing debt, from which the law implies a promise to pay sufficient to maintain an action, yet where the dealings between the parties comprise the purchase of stocks which are to be accounted for, as well as the receipt of money, it also in-cludes, if the balance is found against him, not only payment of the money by the accountant, but the delivery of the specific property in his possession or control. *Buxton* v. *Edwards*, 134 Mass. 567, 578. *Doucette* v. *Baldwin*, 194 Mass. 131. The mutual account between the parties by their method of dealing

having consisted of items of stock as well as of money, there is no sufficient reason why a different course should be pursued in a settlement of their differences when presented to the court. The demands due from one to the other were none the less mutual, whether expressed in shares of stocks or units of money. *Whitwell* v. *Willard*, 1 Met. 216–218. It is not the adjustment of an unliquidated claim based on their value with which the plaintiff is charged, but the specific shares in which the defendant had an unqualified ownership. Instead of a sum of money to be paid in settlement, the accounting results, after a balance has been struck, in shares of stock with the accrued dividends, due to the defendant upon closing the account.

The final decree, therefore, after establishing the legal title might have granted affirmative relief by ordering the plaintiff to make delivery of the stock, and to pay over the dividends to the defendant, which would have avoided further litigation. *Laeber* v. *Langhor*, 45 Md. 477. But the defendant has not appealed, and the final decree having been in conformity with the pleadings and master's report, is affirmed.

*Ordered accordingly.*